UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
HARRY ROLAND,

                Plaintiff,

        - against -

CITY OF NEW YORK; OFFICER ALLAN
ALEXANDER, JOHN DOE 1, JOHN DOE
2, and JOHN DOE 3,

                Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-2240 (PKC) (SJB)

PAMELA K. CHEN, United States District Judge:

Plaintiff Harry Roland, currently incarcerated and proceeding *pro se*, brings this 42 U.S.C. § 1983 claim against four individual Defendants Officer Allan Alexander and John Does 1-3 ("Individual Defendants") and the City of New York ("City") (collectively, "Defendants") for alleged violations of the Fourth and Fourteenth Amendments. Presently before the Court is Defendants' motion for summary judgment. For the reasons stated herein, the Court grants the motion in part and denies it in part.

**BACKGROUND**[1]

---

[1] The Background section is derived from the parties' statements and exhibits filed pursuant to Local Rule 56.1. The Court disregarded assertions of fact that were not "supported by citations to record evidence," and accepted as true statements of fact supported by the record that "the opposing party [] fail[ed] to controvert." *See Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12–13 (2d Cir. 2018) (affirming grant of summary judgment against a *pro se* litigant (citing *Giannullo v. City of N.Y.* 322 F.3d 139, 140 (2d Cir. 2003)). Because "legal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded," *AKF, Inc. v. W. Foot & Ankle Ctr.*, --- F.Supp.3d ----, ---- n.1, No. 19-CV-7118 (PKC) (ST), 2022 WL 4538869, at *1 n.1 (E.D.N.Y. Sept. 28, 2022) (cleaned up), the Court largely ignored Defendants' 56.1 "Reply" to the extent it consisted only of citations to case law. Likewise, the Court disregarded Plaintiff's 56.1 Statement to the extent it was supported solely by his Complaint. *See EC ex rel. RC v. Cnty. of Suffolk*, 882 F.Supp.2d 323, 331 (E.D.N.Y. 2012) ("General citations to reams of pages of testimony . . . and plaintiffs' complaint . . . do not specifically controvert [defendants' 56.1 Statement]") *aff'd sub nom. E.C. ex rel. R.C. v. Cnty. of Suffolk*, 514 F. App'x 28 (2d Cir.

1

I.  Facts

On July 22, 2016, at approximately 1:00 p.m., the New York City Police Department ("NYPD") responded to multiple calls indicating that shots were fired in a residential apartment building in Brighton Beach, Brooklyn. (Defs.' 56.1, Dkt. 58, ¶ 1; Dkt. 59-1, at 1.) One of the callers reported that, as he was entering his apartment, an armed man wearing a black mask approached him from behind and pointed a gun to his head. (Dkt. 59-2, at 1–2.) The two men wrestled; shots were fired; and the perpetrator escaped. (*Id.*) NYPD officers soon apprehended Plaintiff, who was in the vicinity of the crime scene and reportedly in possession of a loaded firearm. (Defs.' 56.1, Dkt. 58, ¶ 1; Dkt. 59-2, at 1–2.) At about 2:00 or 3:00 p.m. that day, Plaintiff was transported to the NYPD's 60th Precinct. (Defs.' 56.1, Dkt. 58, ¶ 2; Dkt. 59-3, at 14:19-22.) There, officers asked Plaintiff for his name and address, and Plaintiff responded that his name was "Hollywood" and that he resided "in [his] body." (Defs.' 56.1, Dkt. 58, ¶ 3; Dkt. 59-3, 16:6-22, 20:21-23.) After fingerprinting Plaintiff, the police learned that Plaintiff's name was Harry Roland. (Defs.' 56.1, Dkt. 58, ¶ 3; Dkt. 59-3, 15:15-25, 16:1-8, 18:8-12.) The NYPD sent Plaintiff's fingerprints and name to the New York Division of Criminal Justice, which responded with a report—time-stamped July 22, 2016, at 10 p.m.—noting that Plaintiff had several prior

---

2013); *Kesner v. Buhl*, 590 F.Supp.3d 680, 683 n.1 (S.D.N.Y. 2022) ("The Court disregards [plaintiff's] 56.1 Statement, whose citations are only to the Amended Complaint, and as to various propositions contains no citations at all."); *Cavelli v. New York City Dist. Council of Carpenters*, 816 F. Supp. 2d 153, 164 n.11 (E.D.N.Y. 2011) (same). Finally, as Plaintiff is incarcerated and proceeding *pro se*, the Court rejects Defendants' argument that Plaintiff's failure to comply with Local Rule 56.1 means that their motion must be granted. *See Azeez v. City of New York*, 790 F. App'x 270, 274 (2d Cir. 2019) (noting that the district court afforded "sufficient latitude" to a *pro se* plaintiff when declining to dismiss a motion for summary judgment for failure to comply with Local Rule 56.1.).

convictions and, under a section titled "Alerts," that a "DNA SAMPLE [WAS] OWED" from Plaintiff. (Pl.'s 56.1, Dkt. 54-3, ¶ 34; Dkt. 54-4, at 1.)[2]

On July 23, 2016, at approximately 1:46 a.m., Plaintiff was transported to the NYPD's Brooklyn Central Booking ("BCB") facility. (Defs.' 56.1, Dkt. 58, ¶ 5; Dkt. 59-3, 16:23-25.) At the BCB, NYPD officers asked Plaintiff for photos of his iris and for his DNA sample, but Plaintiff refused, was put in a "bullpen," and was informed that he would not see a judge absent compliance. (Dkt. 59-3, at 26-27.)[3] According to Plaintiff, later that day, although officers called his name to see a judge and be arraigned, Defendant Officer Alexander told Plaintiff that he would not see a judge until he relented and provided a DNA sample. (Defs.' 56.1, Dkt. 58, ¶ 6.) Plaintiff declined, and Officer Alexander left Plaintiff in the bullpen. (*Id.*)

Between July 23 and July 25, 2016, on seven different occasions, NYPD officers asked Plaintiff to give a DNA sample; each time, Plaintiff refused. (Defs.' 56.1, Dkt. 58, ¶¶ 6–8.) The officers kept Plaintiff in the bullpen throughout this period. (*Id.*) On July 24, 2016, near midnight, Plaintiff spoke with a Legal Aid attorney. (Dkt. 59-6, at 2.) On July 25, 2016, at about 11:00 a.m., Plaintiff received a notice informing him that he had to "provide a DNA sample for inclusion in the New York State DNA Databank," pursuant to New York State Executive Law § 995(7), because he was convicted in 2010 for a felony and sentenced to a one-year term of incarceration. (Defs.' 56.1, Dkt. 58, ¶ 10; Dkt. 59-7.) Plaintiff refused to sign the notice. (Dkt. 59-7.) Although

---

[2] When he was a teenager, Plaintiff was sentenced to three years' incarceration, and in 2010, when he was 22, Plaintiff was sentenced to eight months' incarceration, both times for possession of a controlled substance. (Dkt. 54-4, at 4–5; Dkt. 59-3, at 65:20-24.) Documents in the record state that the DNA sample was required due to New York's "Executive Law § 995(7)." (Dkts. 59-4, 59-5, at 1.)

[3] Plaintiff alleges that two officers sat at the BCB front desk at the time: Defendant John Doe 1, a Hispanic male who asked to take Plaintiff's iris photo, and Defendant John Doe 2, a Black male who asked Plaintiff for a DNA sample an hour later. (Dkt. 59-3, 27:7-8, 27:12-14, 28–31.)

3

the notice stated that Plaintiff's refusal *could* "subject [him] to prosecution" (*id.*), in conjunction with the notice, Plaintiff was in-fact re-arrested and charged with Obstructing Governmental Administration in the Second Degree ("OGA"). (Defs.' 56.1, Dkt. 58, ¶ 10; Dkt. 59-4.) Shortly after midnight on July 26, 2016, Plaintiff refused to be interviewed by a Legal Aid attorney and instead declared that he wanted to represent himself as to the new OGA charge pending against him. (Defs.' 56.1, Dkt. 58, ¶ 11.)[4]

On July 26, 2016, in the late afternoon, Plaintiff was taken to an arraignment hearing and unsuccessfully attempted to represent himself.[5] (Defs.' 56.1, Dkt. 58, ¶¶ 12–13; Dkt. 59-8, at 4-5, 10:7-11.) At the hearing, Ms. Sherman argued that Plaintiff was under no legal obligation to provide a DNA sample, because his prior convictions did not qualify under Executive Law § 995(7). (Defs.' 56.1, Dkt. 58, ¶ 14.) The Assistant District Attorney ("ADA") present at the hearing argued the opposite. (*Id.*) On July 27, 2016, the NYPD was conclusively on notice that Plaintiff's conviction was not a qualifying conviction under Executive Law § 995(7) and that New York law never required Plaintiff to give any DNA sample. (*Id.* ¶ 15.) The OGA complaint against Plaintiff was dismissed. (Dkt. 59-3, at 69:19-23.)[6]

---

[4] Plaintiff testified that the first time he learned about the reason he was required to give a DNA sample was on July 26, 2016, when meeting with Legal Aid Attorney Marissa Sherman—who represented Plaintiff during his arraignment hearing—before proceeding to the courtroom. (Defs.' 56.1, Dkt. 58, ¶ 8.) However, in connection with Defendants' motion in this case, Plaintiff has failed to adduce any evidence contradicting Defendants' evidence that Plaintiff was notified about his obligation to provide a DNA sample as early as July 25, 2016. (*Compare* Dkt. 54-3, ¶ 10 (disputing the fact of notice with citation to the record) *with* Dkt. 58, ¶ 10.)

[5] The presiding justice asked Plaintiff whether he spoke English. Plaintiff answered: "I don't speak legalese" and accused the presiding justice, multiple times, of "not [being] a judge." (59-8, 2:25, 3:1-21, 4:4 ("That's not a judge. I don't know what the fuck you talking about . . . [y]ou ain't no judge.").) The court waived Plaintiff's appearance, allowed Ms. Sherman to represent Plaintiff in his absence, and granted bail of $250,000. (Dkt. 59-8, at 10:7-11.)

[6] In his deposition, Plaintiff explained that John Doe 3 is a person in "civilian clothes" that spoke with Officer Alexander during the July 26 arraignment and "looked like he had a supervisor

4

On September 2, 2016, the State of New York indicted Plaintiff for burglary, and detained him in the New York Department of Corrections facility on Rikers Island ("Rikers"). (Defs.' 56.1, Dkt. 58, ¶ 17.) When arriving at Rikers, Plaintiff received a handbook informing him that all phone calls except privileged calls were monitored. (Defs.' 56.1, Dkt. 58, ¶¶ 18, 20; Dkt. 59-3, at 57:23-25, 58:1-8.) In relevant part, the handbook provided:

> All calls, except for calls with your attorney or other privileged calls, may be monitored and/or recorded by the Department for security purposes. . . . Your use of the telephone in the Department's facility constitutes your implied consent to such monitoring.

(Dkt. 59-12, at 2.) While Plaintiff was at Rikers, a placard on the wall stated: "INMATE TELEPHONE CONVERSATIONS ARE SUBJECT TO ELECTRONIC MONITORING AND RECORDING IN ACCORDANCE WITH DEPARTMENT POLICY." (Defs.' 56.1, Dkt. 58, ¶ 19; Dkt. 59-11 (typeface in the original.).)[7] In June 2018, Plaintiff was tried on charges of burglary in the first degree and criminal possession of a firearm. (Defs.' 56.1, Dkt. 58, ¶ 22; Dkt. 59-3, at 9:7-18, 54:22-25, 55:1.) As part of that trial, the Kings County District Attorney's Office ("DA's Office") introduced phone calls Plaintiff had made while detained at Rikers, which had been

---

type status." (Dkt. 59-3, 53:1-2; *see also Id.*, 53:3-9 ("Q. How does somebody look like that they have supervisor status? A. Just the authority that he had . . . [w]ell, you know, shit, I got arraigned.").) Although Plaintiff does not know whether John Doe 3 was "an officer of the court" or worked for the NYPD, Plaintiff suspects John Doe 3 "probably could have got [Plaintiff] arraigned on the 23 of 2016." (Dkt. 59-3, 51-52.) Plaintiff's claim against John Doe 3 is based solely on the fact that John Doe 3 looked like a supervisor.

[7] The Court notes that the placard submitted by Defendants in connection with their 56.1 Statement has not been authenticated as having been displayed at Rikers while Plaintiff was there, and therefore is currently inadmissible. *See* Fed. R. Evid. 901(a) ("[T]he proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). However, "in general, even if evidence is not properly authenticated at the summary judgment stage, so long as evidence will be presented in admissible form at trial, it may be considered on summary judgment." *Jibowu v. Target Corp.*, 492 F.Supp.3d 87, 100 n.8 (E.D.N.Y. 2020) (citation omitted).

subpoenaed by the DA's Office. (Defs.' 56.1, Dkt. 58, ¶ 21; Dkt. 59-13; Dkt. 59-3, 56:12-14.) Plaintiff represented himself during the trial. (Dkt. 59-13, at 55.) The jury convicted Plaintiff, who he is currently serving a 20-year sentence. (Dkt. 59-13, at 62:13-14, 58:20-25.)[8]

## II. Procedural History

Plaintiff brought this 42 U.S.C. § 1983 action in April 2019 against seven individual defendants and the City, seeking $200,000 in damages. (Dkt. 1, at ECF[9] 3, 11.) As to his time at BCB, Plaintiff alleged that he had spent "4 days without speaking to his family. . . witout [sic] shower or a hot meal . . . sleeping on a cold floor with rodents crawling around . . . [and with] human waste (urine, defecation, etc.[]) all over the floor and holding cell bench[.]" (*Id.* at ECF 8.) As to his time at Rikers, Plaintiff alleged that his calls were shared with the DA's Office

---

[8] The Court rejects Defendants' remaining 56.1 Statements at paragraphs 23 through 29—as to the contents of the calls, the Departments' policy, and the Department of Corrections' policies—as grounded exclusively in inadmissible hearsay. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."); *Rivera v. Inc. Vill. of Farmingdale*, 29 F.Supp.3d 121, 129–30 (E.D.N.Y. 2013) ("On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial." (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998))). Paragraphs 23 through 29 of Defendants' 56.1 Statement are supported by a transcript of testimony of a witness at Plaintiff's criminal trial, Josette McClean ("McClean"), an investigator in the Legal Division of DOC. (Defs.' 56.1, Dkt. 58, ¶¶ 23–29.) While the Court would have considered the affidavit of a witness willing to testify in this matter, Defendants may not rely on testimony given at another trial. Indeed, "[o]rdinarily, testimony of a nonparty witness that was given at a prior hearing is, when offered for its truth, hearsay." *Askew v. Lindsay*, No. 21-CV-0799, 2022 WL 17748623, at *1 (2d Cir. Aug. 1, 2022) (cleaned up). McClean's testimony does not come within established exception to the hearsay rule, *see* Fed. R. Evid. 801(d), 803, and the record is devoid of any suggestion that McClean has now become "unavailable," *cf.* Fed. R. Evid. 804 (a)–(b). Finally, the Court does not consider that the hearsay testimony of McClean "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts," *see* Fed. R. Evid. 807(a)(2), such as transcripts of the calls and/or office records showing that calls were produced and sent pursuant to a subpoena.

[9] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination

6

without a lawfully issued subpoena. (*Id.* at 10.) On June 4, 2019, the Court *sua sponte* dismissed all the claims in the Complaint other than "Plaintiff's Fourth Amendment claims, based on Plaintiff's unlawful pretrial detention and prosecutorial use of jail telephone recordings allegations," against the Individual Defendants and the City. *See Roland v. City of New York*, No. 19-cv-2240 (PKC) (SMG), 2019 WL 2357842, at *5 (E.D.N.Y. June 4, 2019). Discovery ended on June 21, 2021. (06/21/2021 Docket Entry.) Defendants filed their motion for summary judgment on March 9, 2022, which Plaintiff opposes. (Dkts. 52–65.)

## STANDARD OF REVIEW

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citing Fed. R. Civ. P. 56(a)); *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (same). Once the moving party meets that burden, however, the burden shifts to "the non-movant [who] must set forth specific facts showing that there is a genuine issue for trial." *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) ("The non-movant cannot . . . defeat the motion through mere speculation or conjecture." (cleaned up)); *Spinelli v. City of New York*, 579 F.3d 160, 166–67 (2d Cir. 2009) (same). A factual dispute is genuine if the record contains admissible "evidence upon which a fact-finder could reasonably find for the non-movant." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations."). Relatedly, a factual dispute is material only if it "might affect the outcome of the suit under the governing law." *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "[w]here the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any

7

factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment." *Weiss v. Nat'l Westminster Bank, PLC.*, 993 F.3d 144, 162 (2d Cir. 2021). In deciding a motion for summary judgment, the Court must "review[] all of the evidence in the record" holistically, *see Yadid*, 999 F.3d at 877 (cleaned up), construe "the evidence in the light most favorable to the nonmoving party," and draw "all reasonable inferences and resolv[e] all ambiguities in [the nonmoving party's] favor." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (citations and brackets omitted).

Where the plaintiff is acting *pro se*, the Court has a duty to interpret his "papers liberally to raise the strongest arguments that they suggest[,]" including at the summary judgment phase of the proceedings. *See Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015); *Perez v. Metro. Corr. Ctr. Warden*, 5 F. Supp. 2d 208, 211 (S.D.N.Y. 1998) (noting, on summary judgment, that the district court must "read the *pro se* party's supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." (cleaned up)), *aff'd sub nom. Perez v. Metro. Corr. Ctr.'s Warden*, 181 F.3d 83 (2d Cir. 1999).

# DISCUSSION

## I.    Section 1983

"Section 1983 is derived from § 1 of the Civil Rights Act of 1871," and "was intended to create a species of tort liability in favor of persons deprived of federally secured rights." *Smith v. Wade*, 461 U.S. 30, 34 (1983) (cleaned up); *see also Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) ("Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979) (same). A Section 1983 claim requires plaintiff to show that a "[1] person, [2] has deprived him of a federal right," and "[3] that the person . . . acted under color of

8

state or territorial law." *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980). A "§ 1983 action, like its state tort analogs, employs the principle of proximate causation." *See Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999); *Warner v. Orange Cnty. Dep't of Prob.*, 115 F.3d 1068, 1071 (2d Cir. 1996) (finding it "crystal clear that principles of causation . . . are relevant to civil rights actions brought under section 1983." (cleaned up)). Thus, "[i]n order to establish his claim for damages under Section 1983," a plaintiff must "establish that defendants' actions were a proximate cause of plaintiff's alleged injuries." *Turner v. White*, 443 F. Supp. 2d 288, 296 (E.D.N.Y. 2005); *accord Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991) ("[§ 1983 action elements are] (1) a violation of [federal] rights [], (2) proximately caused (3) by conduct of a person, (4) acting under color of state law." (cleaned up)); *see also* Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 1.04 (4th ed. 2022) (same); *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (discussing causation in § 1983 actions).

## II. Plaintiff's Pre-Arraignment Confinement Claim

An unreasonable and extended confinement is a cognizable injury under the Fourth Amendment. *See Marom v. City of New York*, No. 15-CV-2017 (PKC), 2016 WL 916424, at *7 (S.D.N.Y. March 7, 2016) ("The Fourth Amendment . . . governs the procedures applied during some period following an arrest." (citing *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005)); *Walker v. City of New York*, No. 11-CV-314 (CBA) (JMA), 2014 WL 12652345, at *6 (E.D.N.Y. Sept. 3, 2014) (analyzing "the existence of an unreasonable delay" as a "violation of the Fourth Amendment."), *aff'd*, 638 F. App'x 29 (2d Cir. 2016); *Zalewski v. City of New York*, No. 13-CV-7015 (ARR) (PK), 2018 WL 5113137, at *8 (E.D.N.Y. Oct. 19, 2018) (same).[10] In 2019, the Court construed Plaintiff's claim for excessive detention and the conditions of his pre-arraignment confinement as a single violation of the Fourth Amendment. *See Roland*, 2019 WL 2357842 at *3. In 2020, however, the Second Circuit effectively resolved a then-ongoing debate within the circuit, holding that injuries, stemming from unreasonable pre-arraignment conditions, violate the Due Process Clause of the Fourteenth Amendment. *See Shakir v. Stankye*, 805 F. App'x 35, 40 (2d Cir. 2020) ("*Shakir-II*"). In *Shakir*, a plaintiff, proceeding *pro se*, argued that he was "ordered . . . to strip down to one layer of clothing, taunte[d], placed [] in a holding cell, and [that an officer] turned up the air conditioning [in the cell to torment him]." *Shakir v. Derby Police*

---

[10] District courts in this Circuit once disagreed whether an injury resulting from the conditions or circumstances of pre-arraignment detention violated the Fourth Amendment or the Fourteenth Amendment's Due Process Clause. *Compare Lewis v. Clarkstown Police Dept.*, No. 11 Civ. 2487 (ER), 2014 WL 6883468, at *5 (S.D.N.Y. Dec. 8, 2014) (applying the Fourth Amendment to a plaintiff's claim that he was denied medical treatment during his arrest) *with Goodwin v. Kennedy*, No. 13-CV-1774 (SJF) (AKT), 2015 WL 1040663, at *7–10 (E.D.N.Y. March 10, 2015) (noting a "split of authority" amongst the districts, and concluding that "the Due Process Clause provides the proper constitutional grounds for analyzing Plaintiff's denial of medical care claim."). As stated *supra*, district courts agree that an injury resulting from the duration of pre-arraignment detention violates the Fourth Amendment.

*Dep't*, 284 F.Supp.3d 165, 208 (D. Conn. 2018) ("*Shakir-I*"). The district court construed plaintiff's claim as one of "unconstitutional conditions of confinement[]," concluded "that the conduct in question occurred prior to arraignment," and analyzed the claim under the Fourth Amendment. *Id.* 206–08. The Second Circuit reversed and concluded that "the district court should have construed [plaintiff's] conditions of confinement claim as arising under the Fourteenth Amendment rather than the Fourth." *See Shakir-II*, 805 F. App'x. at 40 ("[W]e have treated . . . pre-arraignment conditions of confinement claims as arising under the Fourteenth Amendment.").

Here, Plaintiff alleges in his Complaint that:

> [Pre-arraignment,] ROLAND spent 4 days without speaking to his family due to BCB not having no phones so arrestees can use, 4 days witout [sic] shower or a hot meal. 4 days sleeping on a cold floor with rodents crawling around; lets [sic] not forget the human waste (urine, defecation, etc.[]) all over the floor and holding cell bench; cruel is a[n] understatement.

(Dkt. 1, at 8.) Informed by developments in the relevant case law, the Court now reframes Plaintiff's Complaint as raising two independent claims, one challenging the fact of his excessive pre-arraignment confinement under the Fourth Amendment, and another attacking the conditions of his pre-arraignment confinement under the Due Process Clause of the Fourteenth Amendment.[11]

---

[11] While neither party briefed this intervening change in the law, as discussed, the Court's duty to interpret a *pro se* plaintiff's "papers liberally to raise the strongest arguments that they suggest" persists through summary judgment. *See Willey*, 801 F.3d at 62; *Perez*, 5 F. Supp. 2d at 211; *see also Shakir II*, 805 F. App'x at 40 (affirming district court's decision to reframe a *pro se* plaintiff's claim while deciding defendants' motion for summary judgment); *In re Trusts Established under the Pooling & Servicing Agreements*, 375 F.Supp.3d 441, 446 (S.D.N.Y. 2019) (noting that "[t]he Court has an independent obligation to apply the correct legal standard.").

### A.   Material Issues of Fact Preclude Summary Judgment on Plaintiff's Fourth Amendment Excessive Confinement Claim

First, Plaintiff argues that his Fourth Amendment rights were violated when he was detained for more than 48 hours without a judicial officer determining whether there was probable cause for his arrest.

#### 1.   Legal Standard

Under the common law, "even if an initial arrest is valid, a claim for false imprisonment lies . . . if a plaintiff is thereafter unreasonably detained." *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 201 (S.D.N.Y. 2001), *aff'd*, 48 F. App'x 363 (2d Cir. 2002). Thus, through Section 1983, "[t]he Fourth Amendment shields arrestees from police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure." *Lauro v. Charles*, 219 F.3d 202, 212 (2d Cir. 2000). Courts generally presume the "reasonableness [of] pre-trial detentions that last for fewer than 48 hours," *Miller v. City of New York*, 700 F. App'x 57, 59 (2d Cir. 2017) (citing *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)), but detentions that last for more than 48 hours without a judicial determination of probable cause are presumptively unreasonable. *See McLaughlin*, 500 U.S. at 57 ("Where an arrested individual does not receive a probable cause determination within 48 hours, the calculus changes. In such a case, the arrested individual does not bear the burden of proving an unreasonable delay."); *see Bryant v. City of New York*, 404 F.3d 128, 138 (2d Cir. 2005) ("What is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours."). Plaintiffs bear the burden to rebut the presumption that detention for less than 48 hours was reasonable, *McLaughlin*, 500 U.S. at 56–57 (observing that the presumption is rebutted if the "arrested individual can prove that his or her probable cause determination was delayed unreasonably . . . [for purposes like] . . . gathering additional evidence to justify the arrest, a delay

12

motivated by ill will against the arrested individual, or delay for delay's sake."); and, correspondingly, Defendants bear the burden to rebut the presumption that detention for more than 48 hours was unreasonable. *Id.* ("[T]he burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance.").[12]

### 2. Application

Material dispute of fact prevents summary judgment, or a finding of qualified immunity, on this claim. First, because it is undisputed that Plaintiff was kept for more than 48 hours without seeing a judge who would determine the existence of probable cause, the confinement was presumptively unreasonable.[13] Thus, the burden shifts to Defendants to justify their actions.

---

[12] Plaintiff appears to argue that the delay was unreasonable because it was motivated by the officers' ill will. However, given that it is undisputed that Plaintiff was detained for more than 48 hours without seeing a judicial officer, he need not prove the unreasonableness of his detention. Unreasonableness is presumed. Defendants instead bear the burden to justify the presumptively unreasonable delay. To the extent Plaintiff argues that Defendants' sole basis for delaying his appearance before a judge was malice, the Court addresses that claim below.

[13] District courts in this Circuit are split as to whether a plaintiff may maintain a *McLaughlin* claim following conviction on his arrest. *Compare Cruz v. Reiner*, No. 11-CV-2131 (BMC) (SMG), 2011 WL 6204101, at *3 (E.D.N.Y. Dec. 12, 2011) ("[P]laintiff was convicted of two drug charges by way of guilty plea" and thus was "not deprived of a constitutional right by not being arraigned for three days[.]") *with Wang v. Vahldieck*, No. 09-CV-3783 (ARR) (VVP), 2012 WL 119591, at *9 (E.D.N.Y. Jan. 9, 2012) (allowing a *McLaughlin* claim of a plaintiff who pleaded guilty to proceed). Those courts that disallow a convicted plaintiff's claim to proceed, rely on *Cameron v. Fogarty*, 806 F.2d 380, 387 (2d Cir. 1986). In *Cameron*, the Second Circuit did not mince words: "[a] plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested." *Id.* A close reading of *Cameron*, however, shows that the Second Circuit relied on the common law rule that a conviction amounted to irrefutable proof that an arrest had probable cause, and defeated claims for which probable cause was a defense. *Id.* at 387 ("[C]onviction of the accused conclusively establishes the existence of probable cause." (citation omitted)). Unreasonable delay claims, however, do not turn on the absence of probable cause. As explained *supra*, under the common law, "even if an initial arrest is valid, a claim for false imprisonment lies . . . if a plaintiff is thereafter unreasonably detained." *Gonzalez*, 147 F. Supp. 2d at 201, *aff'd*, 48 F. App'x 363 (2d Cir. 2002) (emphasis added); *accord Kelly v. State*, 105 A.D.2d 905, 906, 482 N.Y.S.2d 70, 71 (1984) ("In this warrantless arrest situation, an undue delay in arraigning claimant could vitiate the existence of probable cause."); *see also Zalewski v. City of New York*, 2018 WL 5113137, at *9 ("[B]ecause the plaintiff's complaint against [defendant] pertains to the length of time that the plaintiff was in custody, it is simply no answer

13

Defendants' defense is that Plaintiff was unreasonably belligerent throughout his detention. (Dkt. 60, at 9 ("[P]laintiff's delay was not unreasonable but instead was caused by plaintiff's own actions. Plaintiff [was] uncooperative[.]").) Plaintiff responds that malice, and nothing more, motivated the officers' actions. (Dkt. 54-1, at 6–7.) Both versions of events find some support in the record. First, while the record shows that Plaintiff refused multiple times to give a DNA sample, it is also undisputed that the requirement to give the DNA sample was baseless from its inception (and the charge relating to it was soon dismissed). While Defendants produced evidence that Plaintiff was combative during his arraignment hearing, Plaintiff testified that prior to his arraignment the officers had locked him in a cell for four days, where roaches roamed free and human feces were smeared on the walls, which caused him to become agitated. (Dkt. 59-3, at 37:12–13 ("I was there for approximately, four days."); *id.* at 37:25, 38:1–3 ("I was in [BCB and] slept on the floor cockroaches crawling around. Defecation all over the walls, on the floor[.]"); Dkt. 59-3, at 37:17–25 ("Q.[] how were you feeling [after your first night in BCB]? . . . A. . . . [O]f course I was mad.").) Further, the evidence shows that Plaintiff was only informed of the basis for his obligation to provide a DNA sample on July 25, 2016, when he was re-arrested on the OGA charge. (Defs.' 56.1, Dkt. 58, ¶ 10; Dkt. 59-4.) Thus, liberally construed, Plaintiff's theory of this case is that the conditions of his confinement at BCB pre-arraignment caused him to become agitated, and that, regardless of his agitation, NYPD officers could have arraigned him sooner, but

---

for the defendants to say that [defendant] believed that there was probable cause for the plaintiff's original arrest."). The same conclusion is reached when considering the practical reasons that undergird the Supreme Court's precedents, which can aptly be described as prophylactic. *See McLaughlin*, 500 U.S. at 58 ("Everyone agrees that the police should make every attempt to minimize the time a presumptively innocent individual spends in jail."); *Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of [the police] can be subjected to the more detached, neutral scrutiny of a judge[.]"); *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975) (same).

14

kept him confined in the above-mentioned conditions to penalize him for his refusal to comply with the NYPD's (unjustified) request to give a DNA sample.[14] A reasonable jury could credit Plaintiff's version of events; another could reject it as baseless. Conflicting versions of events, which find support in the record, require denial of summary judgment. *See Sorensen v. City of New York*, No. 98-CV-3356 (HR), 2003 WL 169775, at *4 (S.D.N.Y. Jan. 23, 2003) ("The question of whether [defendant] intentionally delayed plaintiff's arraignment is one of intent and therefore cannot be resolved on a motion for summary judgment . . . While an intent to delay [is difficult to prove], it is beyond peradventure that the intent . . . is a question for the trier of fact."). For the same reason, Defendants' request for qualified immunity is denied as premature.[15]

### B. Material Issues of Fact Preclude Summary Judgment on the Conditions of Pre-Arraignment Confinement Claim

#### 1. Legal Standard

Plaintiff challenges the conditions under which the NYPD kept him, and following *Shakir-II*, the Court construes his claim as alleging a violation of the Due Process Clause of the Fourteenth Amendment. "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional

---

[14] Defendants argue that there is nothing in the record that directly proves that the officers harbored malice against Plaintiff. However, as courts in this Circuit routinely instruct, "[r]arely is direct proof available to establish the state of one's mind. This may be inferred from what he says or does: his words, his actions, and his conduct[.]" 1 Modern Federal Jury Instructions, Criminal § 6.06 (relying on *United States v. Lloyd*, No. 80-CR-369 (S.D.N.Y. 1980)). As explained above, circumstantial evidence of the officers' conduct may allow a jury to infer malicious intent.

[15] Considering the bright-line rule that the Supreme Court announced in *McLaughlin*, the Court cannot find that Defendants would be entitled to qualified immunity if the jury finds Plaintiff's version of events to be true. *See Case v. City of New York*, 233 F.Supp.3d 372, 387–88 (S.D.N.Y. 2017) (denying qualified immunity on a *McLaughlin* claim because "[t]he rule . . . that officers cannot intentionally delay an arraignment for no reason—was clearly established at the time of plaintiffs' arrest and detention. No reasonable officer could have believed it was permissible to intentionally delay a plaintiff's arraignment based on ill will or delay for delay's sake." (cleaned up) (collecting cases)).

15

conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Shakir-II*, 805 F. App'x at 40 (citing *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017)). To prevail, a plaintiff must satisfy two prongs: (1) an "objective prong," by "showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process," and (2) a "subjective prong," by "showing that the officer acted with at least deliberate indifference to the challenged conditions," including by "recklessly fail[ing] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee[,] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*

### 2. Application

Material issues of fact preclude summary judgment on this claim. First, Plaintiff's deposition allegations—that he was forced to sleep on the floor, for nearly four days, in a cell with walls covered with human excrement and roaches crawling everywhere—are generally on par with conditions that the Second Circuit has found to satisfy the objective prong. *See Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (finding a colorable Eighth Amendment claim where a prisoner alleged that his cell was infested with mice and the area in front of his cell "was filled with human feces, urine, and sewage water" for several consecutive days); *Darnell*, 849 F.3d at 24 (finding the objective prong satisfied when a plaintiff was kept in a cell where the rim and bowl of the toilet, "along with the surrounding floor and walls, were covered with some combination of feces, maggots, urine, vomit, and rotten milk," and with "roaches, mice, and other insects and vermin [being] commonplace in the area around the toilets.").[16]

---

[16] The Court is reading the evidence, which is admittedly minimal, in "the light most favorable to the non-moving party and draw[ing] all reasonable inferences in its favor." *See American Casualty Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994). Thus, the Court

16

Second, a material factual dispute exists as to the subjective prong. Plaintiff's testimony may allow a reasonable jury to deduce that his suffering was in plain sight. A reasonable jury could credit Plaintiff's testimony that he slept on the floor in a cell where human fecal matter was smeared all over the walls and roaches crawled everywhere. The same jury could conclude that the officers deliberately ignored a risk to Plaintiff's health when entering the cell multiple times without taking any action with respect to the cell's conditions. While other evidence in the record may allow the jury to draw opposing inferences, the Court will not usurp the role of the jury in this matter. These factual disputes also preclude a finding of qualified immunity at this juncture, given the well-established case law regarding the unconstitutionality of such conditions, discussed above. *See Case*, 233 F. Supp. at 388 ("Where the circumstances are in dispute, and contrasting accounts present unresolved factual issues a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity" (cleaned up)); *Carrillos v. Inc. Vill. of Hempstead*, 87 F. Supp. 3d 357, 375 (E.D.N.Y. 2015) ("The above-referenced factual disputes also prevent the Court from determining at the summary judgment stage that [the officer] merits qualified immunity." (collecting cases)); *Bryant v. Steele*, 462 F. Supp. 3d 249, 262 (E.D.N.Y. 2020) ("Given this factual dispute, the Court may not rule on qualified immunity at this stage of the litigation."), *aff'd sub nom. Bryant v. Iheanacho*, 859 F. App'x 604 (2d Cir. 2021).

---

accepts Plaintiff's deposition statements at face-value, and to the extent they are ambiguous, infers from them that his pre-arraignment conditions were indeed severe. Furthermore, because changes in the case law necessitate a reframing of Plaintiff's claim, the Court is especially mindful that a *pro se* litigant must merely "support his claims *with some evidence* to survive summary judgment." *See Nguedi v. Fed. Rsrv. Bank of New York*, 813 F. App'x 616, 618 (2d Cir. 2019) (emphasis added); *see also Perez*, 5 F. Supp. 2d at 211 (noting, in the context of a *pro se* litigant, that "the non-moving party must provide this Court with some basis to believe that his or her version of relevant events is not fanciful." (cleaned up)), *aff'd sub nom. Perez v. Metro. Corr. Ctr.'s Warden*, 181 F.3d.

**III.     Plaintiff's Unlawful Search Claim**

The Court rejects Plaintiff's claim that Defendants violated the Fourth Amendment when Rikers, in response to a subpoena, provided to the DA's Office recorded phone calls that Plaintiff made while he was confined. "The Fourth Amendment guarantees that 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968). "By virtue of its incorporation through the Fourth Amendment's Due Process Clause, the Fourth Amendment is binding on states and, relevant here, municipalities such as New York City." *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 480–81 (S.D.N.Y. 2019). However, the Fourth Amendment only shields from intrusions flouting some "expectation of privacy that society is prepared to consider reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987). "A person has a reasonable expectation of privacy only if they seek to keep something private and have an objectively reasonable expectation that it will remain private." *United States v. Maxwell*, 545 F. Supp. 3d 72, 80 (S.D.N.Y. 2021). "The Supreme Court has held that people generally lack a reasonable expectation of privacy in information they voluntarily disclose to others," even when they expect that the information will be "safeguarded and used only for specific purposes." *Id.* Here, the record shows that the State of New York repeatedly informed Plaintiff that his calls were monitored. Thus, as a matter of fact, Plaintiff could have entertained no reasonable expectation of privacy in his phone calls. Likewise, Plaintiff could have entertained no such expectation as a matter of law. The Second Circuit has held that: "[g]iven [detention facilities] strong interest in preserving security, . . . the interception of calls from inmates to noninmates does not violate the privacy rights of the noninmates [under the Fourth Amendment]." *United States v. Willoughby*, 860 F.2d 15, 22 (2d Cir. 1988). Previously, the Court allowed Plaintiff's Fourth Amendment claim

18

to proceed based on allegations that Rikers acted capriciously when voluntarily transferring Plaintiff's calls to the DA's Office, seemingly without any subpoena compelling it to do so. Following discovery, Plaintiff has offered nothing to undermine the fact that a lawful subpoena—a copy of which is now in the record—was issued to Rikers and compelled it to transfer his calls to the DA's Office. On this record, Plaintiff's claim fails both on grounds that he had no reasonable expectation of privacy in his calls, and that his residual expectation of privacy that his calls would be transferred to third parties only pursuant to lawful procedures was not frustrated.

Plaintiff cites *Carpenter v. United States*, 138 S. Ct. 2206 (2018) and *Riley v. California*, 573 U.S. 373 (2014) for the general proposition that there is some constitutional "expectation[] of privacy even if the information sought-after is held by a third party." (Dkt. 54-1, at 11.) Neither case is on point. Both *Carpenter* and *Riley* were concerned with searches of electronic data derived from personal cell phones. *See Carpenter*, 138 S. Ct. at 2211, 2215 (discussing "personal location information" that may provide a "comprehensive chronicle of the user's past movements"); *Riley*, 573 U.S. at 378 (discussing "digital information on a cell phone seized from an individual who has been arrested."); *see also Maxwell*, 545 F. Supp. 3d at 80 (describing *Carpenter* as a "lone exception" to the general rule that one has no privacy interest in information they voluntarily give others). Searches of phone calls, made in detention facilities, are temporally limited and do not carry the same risk of sweeping intrusion into one's intimate communications and whereabouts as searches of personal cellular data. Second, neither case arose in the context of detention facilities. *See Willoughby*, 860 F.2d at 21 ("[A]lthough pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, . . . the maintenance of prison security and the preservation of institutional order and discipline are essential goals that may require limitation or retraction of [these rights]."); *accord United States v. Jarmon*, 14 F.4th 268, 272 (3d Cir. 2021),

19

*cert. denied*, 142 S. Ct. 930 (2022) ("Unlike an ordinary cell phone user who in no meaningful sense assumes the risk of turning over a comprehensive dossier of his physical movements when he turns on his phone. . . [defendants] did assume the risk of surveillance here . . . [because] after being told their calls [in prison] were monitored, they continued [using the facility phones]."). As previously stated, the record shows that Plaintiff conversed, voluntarily, on a detention facility's phones, despite being notified that his calls were monitored for some purpose. Defendants adduced copies of the subpoena that compelled Rikers to deliver the calls to the DA's Office, which Plaintiff failed to rebut with any admissible evidence. Thus, the Court finds that Defendants are entitled to summary judgment as to Plaintiff's Fourth Amendment claim.[17]

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. All pending motions are denied as moot.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: March 22, 2023
       Brooklyn, New York

---

[17] Plaintiff further argues that the subpoena allowed Rikers to transfer Plaintiff's phone calls only to the New York Supreme Court directly, but that Rikers sent the recorded calls instead to the Kings County District Attorney's Office, thereby "violat[ing] clearly established law when it came to the mishandling of subpoena records." (Dkt. 54-1, at 12.) Plaintiff refers to no evidence whatsoever to support his argument. "Speculation and conclusory assertions—made without even a scintilla of evidence—cannot defeat a motion for summary judgment." *Dorsey v. Gannon*, No. 20-CV-1525 (PKC) (PK), 2022 WL 4660555, at *4 (E.D.N.Y. Sept. 30, 2022) (citing *Nguedi v. Fed. Rsrv. Bank of New York*, 813 F. App'x 616, 617 (2d Cir. 2020)).